(Slip Opinion)   OCTOBER TERM, 2008   1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARIZONA *v.* JOHNSON

### CERTIORARI TO THE COURT OF APPEALS OF ARIZONA

No. 07–1122.   Argued December 9, 2008—Decided January 26, 2009

In *Terry* v. *Ohio*, 392 U. S. 1, this Court held that a "stop and frisk" may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures if two conditions are met. First, the investigatory stop (temporary detention) must be lawful, a requirement met in an on-the-street encounter when a police officer reasonably suspects that the person apprehended is committing or has committed a crime. Second, to proceed from a stop to a frisk (patdown for weapons), the officer must reasonably suspect that the person stopped is armed and dangerous. For the duration of a traffic stop, the Court recently confirmed, a police officer effectively seizes "everyone in the vehicle," the driver and all passengers. *Brendlin* v. *California*, 551 U. S. 249, 255.

While patrolling near a Tucson neighborhood associated with the Crips gang, police officers serving on Arizona's gang task force stopped an automobile for a vehicular infraction warranting a citation. At the time of the stop, the officers had no reason to suspect the car's occupants of criminal activity. Officer Trevizo attended to respondent Johnson, the back-seat passenger, whose behavior and clothing caused Trevizo to question him. After learning that Johnson was from a town with a Crips gang and had been in prison, Trevizo asked him get out of the car in order to question him further, out of the hearing of the front-seat passenger, about his gang affiliation. Because she suspected that he was armed, she patted him down for safety when he exited the car. During the patdown, she felt the butt of a gun. At that point, Johnson began to struggle, and Trevizo handcuffed him. Johnson was charged with, *inter alia*, possession of a weapon by a prohibited possessor. The trial court denied his motion to suppress the evidence, concluding that the stop was lawful and that Trevizo had cause to suspect Johnson was armed and dangerous.

Johnson was convicted. The Arizona Court of Appeals reversed. While recognizing that Johnson was lawfully seized, the court found that, prior to the frisk, the detention had evolved into a consensual conversation about his gang affiliation. Trevizo, the court therefore concluded, had no right to pat Johnson down even if she had reason to suspect he was armed and dangerous. The Arizona Supreme Court denied review.

*Held:* Officer Trevizo's patdown of Johnson did not violate the Fourth Amendment's prohibition on unreasonable searches and seizures. Pp. 5–9.

    (a) *Terry* established that, in an investigatory stop based on reasonably grounded suspicion of criminal activity, the police must be positioned to act instantly if they have reasonable cause to suspect that the persons temporarily detained are armed and dangerous. 392 U. S., at 24. Because a limited search of outer clothing for weapons serves to protect both the officer and the public, a patdown is constitutional. *Id.*, at 23–24, 27, 30–31. Traffic stops, which "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*," *Berkemer* v. *McCarty*, 468 U. S. 420, 439, n. 29, are "especially fraught with danger to police officers," *Michigan* v. *Long*, 463 U. S. 1032, 1047, who may minimize the risk of harm by exercising "'unquestioned command of the situation,'" *Maryland* v. *Wilson*, 519 U. S. 408, 414. Three decisions cumulatively portray *Terry*'s application in a traffic-stop setting. In *Pennsylvania* v. *Mimms*, 434 U. S. 106 *(per curiam),* the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment," *id.,* at 111, n. 6, because the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle, *id.*, at 110–111. Citing *Terry,* the Court further held that a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver might be armed and dangerous. 434 U. S., at 112. *Wilson*, 519 U. S., at 413, held that the *Mimms* rule applies to passengers as well as drivers, based on "the same weighty interest in officer safety." *Brendlin*, 551 U. S., at 263, held that a passenger is seized, just as the driver is, "from the moment [a car stopped by the police comes] to a halt on the side of the road." A passenger's motivation to use violence during the stop to prevent apprehension for a crime more grave than a traffic violation is just as great as that of the driver. 519 U. S., at 414. And as "the passengers are already stopped by virtue of the stop of the vehicle," *id.*, at 413–414, "the additional intrusion on the passenger is minimal," *id.*, at 415. Pp. 5–7.

Syllabus

    (b) The Arizona Court of Appeals recognized that, initially, Johnson was lawfully detained incident to the legitimate stop of the vehicle in which he was a passenger, but concluded that once Officer Trevizo began questioning him on a matter unrelated to the traffic stop, pat-down authority ceased to exist, absent reasonable suspicion that Johnson had engaged, or was about to engage, in criminal activity. The court portrayed the interrogation as consensual, and, Johnson emphasizes, Trevizo testified that Johnson could have refused to exit the vehicle and to submit to the patdown. But Trevizo also testified that she never advised Johnson he did not have to answer her questions or otherwise cooperate with her. A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration. See *Muehler* v. *Mena*, 544 U. S. 93, 100–101. A reasonable passenger would understand that during the time a car is lawfully stopped, he or she is not free to terminate the encounter with the police and move about at will. Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free "to depart without police permission." *Brendlin*, 551 U. S., at 257. Trevizo was not required by the Fourth Amendment to give Johnson an opportunity to depart without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her. Pp. 7–9.

217 Ariz. 58, 170 P. 3d 667, reversed and remanded.

    GINSBURG, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–1122

### ARIZONA, PETITIONER *v.* LEMON MONTREA JOHNSON

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF ARIZONA, DIVISION TWO

[January 26, 2009]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the authority of police officers to "stop and frisk" a passenger in a motor vehicle temporarily seized upon police detection of a traffic infraction. In a pathmarking decision, *Terry* v. *Ohio*, 392 U. S. 1 (1968), the Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures. The Court upheld "stop and frisk" as constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

For the duration of a traffic stop, we recently confirmed, a police officer effectively seizes "everyone in the vehicle," the driver and all passengers. *Brendlin* v. *California*, 551

U. S. 249, 255 (2007).  Accordingly, we hold that, in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.  The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity.  To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

I

On April 19, 2002, Officer Maria Trevizo and Detectives Machado and Gittings, all members of Arizona's gang task force, were on patrol in Tucson near a neighborhood associated with the Crips gang.  At approximately 9 p.m., the officers pulled over an automobile after a license plate check revealed that the vehicle's registration had been suspended for an insurance-related violation.  Under Arizona law, the violation for which the vehicle was stopped constituted a civil infraction warranting a citation.  At the time of the stop, the vehicle had three occupants—the driver, a front-seat passenger, and a passenger in the back seat, Lemon Montrea Johnson, the respondent here.  In making the stop the officers had no reason to suspect anyone in the vehicle of criminal activity.  See App. 29–30.

The three officers left their patrol car and approached the stopped vehicle.  Machado instructed all of the occupants to keep their hands visible.  *Id.*, at 14.  He asked whether there were any weapons in the vehicle; all responded no.  *Id.*, at 15.  Machado then directed the driver to get out of the car.  Gittings dealt with the front-seat passenger, who stayed in the vehicle throughout the stop.

See *id.*, at 31. While Machado was getting the driver's license and information about the vehicle's registration and insurance, see *id.*, at 42–43, Trevizo attended to Johnson.

Trevizo noticed that, as the police approached, Johnson looked back and kept his eyes on the officers. *Id.*, at 12. When she drew near, she observed that Johnson was wearing clothing, including a blue bandana, that she considered consistent with Crips membership. *Id.*, at 17. She also noticed a scanner in Johnson's jacket pocket, which "struck [her] as highly unusual and cause [for] concern," because "most people" would not carry around a scanner that way "unless they're going to be involved in some kind of criminal activity or [are] going to try to evade the police by listening to the scanner." *Id.*, at 16. In response to Trevizo's questions, Johnson provided his name and date of birth but said he had no identification with him. He volunteered that he was from Eloy, Arizona, a place Trevizo knew was home to a Crips gang. Johnson further told Trevizo that he had served time in prison for burglary and had been out for about a year. 217 Ariz. 58, 60, 170 P. 3d 667, 669 (App. 2007).

Trevizo wanted to question Johnson away from the front-seat passenger to gain "intelligence about the gang [Johnson] might be in." App. 19. For that reason, she asked him to get out of the car. *Ibid.* Johnson complied. Based on Trevizo's observations and Johnson's answers to her questions while he was still seated in the car, Trevizo suspected that "he might have a weapon on him." *Id.*, at 20. When he exited the vehicle, she therefore "patted him down for officer safety." *Ibid.* During the patdown, Trevizo felt the butt of a gun near Johnson's waist. 217 Ariz., at 60, 170 P. 3d, at 669. At that point Johnson began to struggle, and Trevizo placed him in handcuffs. *Ibid.*

Johnson was charged in state court with, *inter alia*, possession of a weapon by a prohibited possessor. He

moved to suppress the evidence as the fruit of an unlawful search. The trial court denied the motion, concluding that the stop was lawful and that Trevizo had cause to suspect Johnson was armed and dangerous. See App. 74–78. A jury convicted Johnson of the gun-possession charge. See 217 Ariz., at 60–61, 170 P. 3d, at 669–670.

A divided panel of the Arizona Court of Appeals reversed Johnson's conviction. *Id.*, at 59, 170 P. 3d, at 668. Recognizing that "Johnson was [lawfully] seized when the officers stopped the car," *id.*, at 62, 170 P. 3d, at 671, the court nevertheless concluded that prior to the frisk the detention had "evolved into a separate, consensual encounter stemming from an unrelated investigation by Trevizo of Johnson's possible gang affiliation," *id.*, at 64, 170 P. 3d, at 673. Absent "reason to believe Johnson was involved in criminal activity," the Arizona appeals court held, Trevizo "had no right to pat him down for weapons, even if she had reason to suspect he was armed and dangerous." *Ibid.*

Judge Espinosa dissented. He found it "highly unrealistic to conclude that merely because [Trevizo] was courteous and Johnson cooperative, the ongoing and virtually simultaneous chain of events [had] somehow 'evolved into a consensual encounter' in the few short moments involved." *Id.*, at 66, 170 P. 3d, at 675. Throughout the episode, he stressed, Johnson remained "seized as part of [a] valid traffic stop." *Ibid.* Further, he maintained, Trevizo "had a reasonable basis to consider [Johnson] dangerous," *id.*, at 67, 170 P. 3d, at 676, and could therefore ensure her own safety and that of others at the scene by patting down Johnson for weapons.

The Arizona Supreme Court denied review. No. CR–07–0290–PR, 2007 Ariz. LEXIS 154 (Nov. 29, 2007). We granted certiorari, 554 U. S. ___ (2008), and now reverse the judgment of the Arizona Court of Appeals.

## II
### A

We begin our consideration of the constitutionality of Officer Trevizo's patdown of Johnson by looking back to the Court's leading decision in *Terry* v. *Ohio*, 392 U. S. 1 (1968). *Terry* involved a stop for interrogation of men whose conduct had attracted the attention of a patrolling police officer. The officer's observation led him reasonably to suspect that the men were casing a jewelry shop in preparation for a robbery. He conducted a patdown, which disclosed weapons concealed in the men's overcoat pockets. This Court upheld the lower courts' determinations that the interrogation was warranted and the patdown, permissible. See *id.*, at 8.

*Terry* established the legitimacy of an investigatory stop "in situations where [the police] may lack probable cause for an arrest." *Id.*, at 24. When the stop is justified by suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot, the Court explained, the police officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous. *Ibid.* Recognizing that a limited search of outer clothing for weapons serves to protect both the officer and the public, the Court held the patdown reasonable under the Fourth Amendment. *Id.*, at 23–24, 27, 30–31.

"[M]ost traffic stops," this Court has observed, "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." *Berkemer* v. *McCarty*, 468 U. S. 420, 439, n. 29 (1984). Furthermore, the Court has recognized that traffic stops are "especially fraught with danger to police officers." *Michigan* v. *Long*, 463 U. S. 1032, 1047 (1983). "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,'" we have stressed, "'if the officers routinely exercise unquestioned command of the situation.'" *Maryland* v. *Wilson*, 519 U. S.

408, 414 (1997) (quoting *Michigan* v. *Summers*, 452 U. S. 692, 702–703 (1981)); see *Brendlin*, 551 U. S., at 258. Three decisions cumulatively portray *Terry*'s application in a traffic-stop setting: *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977) *(per curiam); Maryland* v. *Wilson*, 519 U. S. 408 (1997); and *Brendlin* v. *California*, 551 U. S. 249 (2007).

In *Mimms*, the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U. S., at 111, n. 6. The government's "legitimate and weighty" interest in officer safety, the Court said, outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. *Id.*, at 110–111. Citing *Terry* as controlling, the Court further held that a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver "might be armed and presently dangerous." 434 U. S., at 112.

*Wilson* held that the *Mimms* rule applied to passengers as well as to drivers. Specifically, the Court instructed that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." 519 U. S., at 415. "[T]he same weighty interest in officer safety," the Court observed, "is present regardless of whether the occupant of the stopped car is a driver or passenger." *Id.*, at 413.

It is true, the Court acknowledged, that in a lawful traffic stop, "[t]here is probable cause to believe that the driver has committed a minor vehicular offense," but "there is no such reason to stop or detain the passengers." *Ibid.* On the other hand, the Court emphasized, the risk of a violent encounter in a traffic-stop setting "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a

more serious crime might be uncovered during the stop." *Id.*, at 414. "[T]he motivation of a passenger to employ violence to prevent apprehension of such a crime," the Court stated, "is every bit as great as that of the driver." *Ibid.* Moreover, the Court noted, "as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle," *id.*, at 413–414, so "the additional intrusion on the passenger is minimal," *id.*, at 415.

Completing the picture, *Brendlin* held that a passenger is seized, just as the driver is, "from the moment [a car stopped by the police comes] to a halt on the side of the road." 551 U. S., at 263. A passenger therefore has standing to challenge a stop's constitutionality. *Id.*, at 256–259.

After *Wilson*, but before *Brendlin*, the Court had stated, in dictum, that officers who conduct "routine traffic stop[s]" may "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Knowles* v. *Iowa*, 525 U. S. 113, 117–118 (1998). That forecast, we now confirm, accurately captures the combined thrust of the Court's decisions in *Mimms*, *Wilson*, and *Brendlin*.

## B

The Arizona Court of Appeals recognized that, initially, Johnson was lawfully detained incident to the legitimate stop of the vehicle in which he was a passenger. See 217 Ariz., at 64, 170 P. 3d, at 673. But, that court concluded, once Officer Trevizo undertook to question Johnson on a matter unrelated to the traffic stop, *i.e.*, Johnson's gang affiliation, patdown authority ceased to exist, absent reasonable suspicion that Johnson had engaged, or was about to engage, in criminal activity. See *id.*, at 65, 170 P. 3d, at 674. In support of the Arizona court's portrayal of Trevizo's interrogation of Johnson as "consensual," Johnson emphasizes Trevizo's testimony at the suppression hearing. Responding to the prosecutor's questions,

Trevizo affirmed her belief that Johnson could have "refused to get out of the car" and "to turn around for the pat down." App. 41.

It is not clear why the prosecutor, in opposing the suppression motion, sought to portray the episode as consensual. Cf. *Florida* v. *Bostick*, 501 U. S. 429 (1991) (holding that police officers' search of a bus passenger's luggage can be based on consent). In any event, Trevizo also testified that she never advised Johnson he did not have to answer her questions or otherwise cooperate with her. See App. 45. And during cross-examination, Trevizo did not disagree when defense counsel asked "in fact you weren't seeking [Johnson's] permission . . . ?" *Id.*, at 36. As the dissenting judge observed, "consensual" is an "unrealistic" characterization of the Trevizo-Johnson interaction. "[T]he encounter . . . took place within minutes of the stop"; the patdown followed "within mere moments" of Johnson's exit from the vehicle; beyond genuine debate, the point at which Johnson could have felt free to leave had not yet occurred. See 217 Ariz., at 66, 170 P. 3d, at 675.[1]

A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. See *Brendlin*, 551 U. S., at 258. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not

---

[1] The Court of Appeals majority did not assert that Johnson reasonably could have felt free to leave. Instead, the court said "a reasonable person in Johnson's position would have felt free to remain in the vehicle." 217 Ariz. 58, 64, 170 P. 3d 667, 673 (2007). That position, however, appears at odds with our decision in *Maryland* v. *Wilson*, 519 U. S. 408 (1997). See *supra*, at 6–7.

convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. See *Muehler* v. *Mena*, 544 U. S. 93, 100–101 (2005).

In sum, as stated in *Brendlin*, a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will. See 551 U. S., at 257. Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free "to depart without police permission." *Ibid.* Officer Trevizo surely was not constitutionally required to give Johnson an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her.[2]

\*    \*    \*

For the reasons stated, the judgment of the Arizona Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[2] The Arizona Court of Appeals assumed, "without deciding, that Trevizo had reasonable suspicion that Johnson was armed and dangerous." 217 Ariz., at 64, 170 P. 3d, at 673. We do not foreclose the appeals court's consideration of that issue on remand.