**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 11-4118**

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

        v.

KOOROSH DASHTIANPOOR ROACH, a/k/a Dash,

              Defendant - Appellant.

———————————

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  Patrick Michael Duffy, Senior
District Judge.  (2:09-cr-00684-PMD-1)

———————————

Argued:  March 23, 2012          Decided:  April 30, 2012

———————————

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme
Court of the United States, sitting by designation, TRAXLER,
Chief Judge, and SHEDD, Circuit Judge.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Russell Warren Mace, III, THE MACE FIRM, Myrtle Beach,
South Carolina, for Appellant.  Jeffrey Mikell Johnson, OFFICE
OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for
Appellee.  **ON BRIEF:** William N. Nettles, United States Attorney,
Columbia, South Carolina, Matthew J. Modica, Assistant United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Charleston, South Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After Koorosh Dashtianpoor Roach was indicted in U.S. District Court for federal drug and firearm offenses, Roach moved to suppress evidence obtained by police during a traffic stop. Roach contended that officers frisked and searched his person multiple times without reasonable suspicion or probable cause and unreasonably prolonged his detention. The District Court rejected Roach's arguments, holding that the frisks, search, and detention were justified under the Fourth Amendment. We now affirm.

I

Based on an informant's tip that Roach was selling heroin, police set up surveillance of a North Charleston residence. Police had obtained a search warrant for a different address associated with Roach, but had learned from the informant that Roach was operating out of the North Charleston residence.

Officers saw numerous vehicles arrive at the residence and leave shortly thereafter. When one vehicle arrived, Roach approached the driver's side window and interacted with the passengers for two minutes until the vehicle departed. Officers stopped the departing vehicle, found heroin, and learned from the driver that he had purchased the heroin from "Dash" —

2

Roach's nickname. When a second vehicle arrived, Roach got into the car, which drove to the perimeter of the subdivision and back, before getting out less than two minutes later. Officers stopped this vehicle as well and heard their narcotics-detection dog alert, though they found no heroin. When a third vehicle arrived, its driver entered the residence and exited promptly. When a fourth vehicle arrived, Roach again got into the car. At this point, an officer relayed the situation and descriptions of the vehicle, driver, other passenger, and Roach's attire to other officers over the radio.

Officers Kruger and Burnem received the information. After identifying the car and seeing Roach in the front seat, they followed the vehicle. When they saw Roach throw a cigarette butt out of the window, they initiated a traffic stop for littering.

Officer Burnem detained the driver, who, after parking the car, had rushed out while leaving the door open. Officer Kruger, meanwhile, approached the passenger's side of the car and saw Roach reaching behind him and into his pants and waistband area with both hands. Officer Kruger drew his weapon, opened up the backseat door, and ordered Roach to show his hands. Both officers testified that Roach raised his hands yet repeatedly brought them back down towards his pants and waistband area.

3

Officer Kruger ordered Roach out of the car. Once out, Roach volunteered something to the effect of, "Go ahead and search me. I have nothing on me." J.A. 81. Officer Kruger testified that when he began the patdown, however, Roach persisted in bringing his hands and elbows to his waist area and resisted spreading his legs and stepping away from the car. Officer Kruger then handcuffed Roach before patting down his chest and pockets. At that point, Officer Kruger passed Roach off to Officer Burnem while he went to inspect the car.

Officer Burnem patted down Roach's legs and discovered a golf ball size bulge by Roach's buttocks area. Officer Burnem discontinued his patdown and informed Detective Pritchard of the Police Department's Narcotics Division of the bulge, which he believed to be drugs. At that moment, a narcotics-detection dog alerted near Roach's car seat.

Detective Pritchard then patted down Roach. Once he confirmed the bulge, he asked Roach to remove the object. Roach stated that he could not do so while handcuffed, but Detective Pritchard did not feel comfortable uncuffing him. He testified that he asked Roach whether the object was illegal and that Roach nodded his head. Detective Pritchard put on gloves, loosened Roach's belt, pulled back his pants, and saw a plastic bag. Touching only the bag, he reached down and pulled it out without searching Roach's anal cavity or exposing his buttocks

4

to public view. The bag contained eleven glassine bags with a total of .44 grams of heroin and .67 grams of cocaine base.

Roach was placed under arrest. As he walked toward the patrol car, a loaded 9mm pistol dropped out of his pants leg. Roach later informed officers that he had concealed the weapon by moving it around his waistband with his elbow.

Roach moved to suppress the drugs and the firearm seized during the traffic stop. The District Court denied the motion. Roach was convicted of possessing heroin and cocaine base with intent to distribute it, possessing a firearm as a felon, and possessing a firearm in furtherance of a drug trafficking offense. See 18 U.S.C. §924(c)(1); 21 U.S.C. §841(a)(1), (b)(1)(B), (c)(1)(C); 18 U.S.C. §§922(g)(1), 924(a)(2). He was sentenced to 130 months in prison and six years of supervised release.

II

On appeal, Roach contends that the police officers violated the Fourth Amendment's proscription against "unreasonable searches and seizures" because (1) there was no reasonable suspicion to justify more than one frisk; (2) there was no probable cause to justify a search of his person; and (3) the detention was unreasonably prolonged. We address each contention in turn, construing the evidence in the light most

5

favorable to the Government, the prevailing party below.  See United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).


A

We first address Roach's argument that the police officers lacked justification to frisk him more than once.

The Supreme Court has long emphasized the "especially hazardous" risks of traffic stops for police officers.  Michigan v. Long, 463 U.S. 1032, 1049 (1983).  To ensure officer safety and the safety of others, the Court has held that a police officer may, as a matter of course, "order passengers to get out of the car pending completion" of a lawful traffic stop. Maryland v. Wilson, 519 U.S. 408, 410, 415 (1997).  A police officer may then, pursuant to Terry v. Ohio, 392 U.S. 1 (1968), pat down the passenger so long as there is "reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 326 (2009).  "Reasonable suspicion" is a "less demanding standard than probable cause," requiring a showing "considerably less than preponderance of the evidence."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

This Court has held that the reasonable suspicion standard "may be satisfied by an officer's objectively reasonable suspicion that drugs are present in a vehicle that he lawfully stops."  United States v. Sakyi, 160 F.3d 164, 169 (4th

6

Cir. 1998); cf. United States v. Perrin, 45 F.3d 869, 873 (4th Cir. 1995) ("it is certainly reasonable for an officer to believe that a person engaged in selling of crack cocaine may be carrying a weapon for protection"). "The indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer." Sakyi, 160 F.3d at 169.

In this case, it bears emphasis that, at the time of the traffic stop, the officers had reasonable suspicion not just of the littering violation but also that drugs were present in the car. A confidential informant had tipped off the police of Roach's involvement in the distribution of heroin. Surveillance at the North Charleston residence of Roach's interactions with several vehicles that day had been consistent with drug transactions. Officers had discovered heroin in one vehicle leaving the residence, which they learned had been purchased from Roach. A narcotics-detection dog had alerted by another departing vehicle. Taken together, those objective facts established reasonable suspicion that Roach was engaged in drug crimes, and accordingly, reasonable suspicion that Roach was carrying or using a weapon.

Roach's conduct during the stop only heightened the officers' suspicion that he possessed a weapon. Roach was seen contorting his body, sitting "upright" and "half off the [front passenger's] seat." J.A. 74-75. While in that strange posture,

7

he repeatedly thrust both hands behind him toward his pants and waistband area, all the while watching Officer Burnem, who was at the time preoccupied with the driver. Roach persisted in these movements, moreover, even after Officer Kruger opened the back door of the car and ordered Roach to put his hands up. Those movements, consistent with concealing or retrieving a weapon, would have led a reasonably prudent officer to fear for his or her safety. See United States v. Hamlin, 319 F.3d 555, 561-672 (4th Cir. 2003) (defendant's "repeated attempts to reach toward his groin area gave [the officer] reason to believe that [the defendant] was armed and dangerous"). Meanwhile, the driver's odd behavior upon being stopped — namely, exiting the vehicle rapidly while leaving the car door ajar — reinforced the officers' apprehension.

Given these circumstances, Roach appears to concede that Officer Kruger had sufficient justification to perform an initial Terry frisk for the presence of weapons. See Brief of Appellant at 13 ("Officer Kruger may have developed a reasonable suspicion to search Roach"). Roach argues, however, that any authority to frisk him under Terry vanished as soon as Officer Kruger's patdown uncovered no weapon. In Roach's view, any subsequent patdown was unlawful because Officer Kruger's failure to detect a weapon on him allayed any reasonable suspicion.

The perception of danger, however, did not dissipate with Officer Kruger's frisk. As an initial matter, Roach impeded Officer Kruger's patdown by defying his instructions. He repeatedly brought his hands and elbows down to his waistband area, sought to remain close to the car, and resisted spreading his feet apart. Those movements indicated that Roach was concerned about something Officer Kruger might find. Indeed, Officer Kruger testified that he was compelled to handcuff Roach during the frisk because Roach's movements caused him to be concerned "for officer safety." J.A. 82.

Officer Kruger's initial patdown, moreover, was hardly comprehensive. Officer Kruger testified that he only patted down Roach's chest and pockets before handing Roach over to Officer Burnem in order to turn his attention to the vehicle. The inseam of Roach's legs was not patted down until Officer Burnem took over; it was thus Officer Burnem who noted the suspicious bulge by Roach's buttocks for the first time.

More generally, we disagree with Roach's suggestion that Officer Kruger alone could check him for weapons. This was a fluid, rapidly developing situation that unfolded within minutes, involving the apprehension of multiple persons and the potential concealment of a weapon in the vehicle. Under such circumstances, Roach's request that we strictly limit the opportunity to perform a protective frisk to only one officer

would impose impractical constraints on officers' ability to screen for weapons and to coordinate among themselves in establishing police command over the scene. Such limits would be at odds with our efforts to apply the "reasonable suspicion" standard with "common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).

At bottom, nothing in Officer Kruger's initial patdown of Roach's chest and pockets negated the objective circumstances justifying a frisk. Thus, Officer Burnem, like Officer Kruger, lawfully frisked Roach based on a reasonable — and, as it turns out, accurate — suspicion that Roach was armed.

B

We next address Roach's contention that Detective Pritchard conducted an illegal search of his person. Roach argues that because a search of one's person is more intrusive than a frisk of one's outer clothing, "probable cause" is required to justify the search.

In this case, "probable cause" supported Detective Pritchard's search. As noted, the confidential informant, the surveillance, and the information and heroin obtained from at

least one departing vehicle all connected Roach to drug crimes, and Roach's strange movements during the traffic stop heightened concerns that he was concealing something on his person. In addition, when Detective Pritchard approached Roach, he knew that Officer Burnem had detected a golf ball size bulge by Roach's buttocks area that, based upon Officer Burnem's training and experience, was indicative of illegal drugs. Detective Pritchard also witnessed the narcotics-detection dog alert by the front passenger's seat of the car where Roach had been sitting. Moreover, when Detective Pritchard asked Roach if the substance in the bulge was illegal, Roach nodded affirmatively. In their totality, these factors sufficed for probable cause to believe Roach was hiding drugs in his pants.

Roach argues that Detective Pritchard could not rely on Officer Burnem's detection of the bulge because Officer Burnem's Terry frisk was unlawful. For reasons already discussed, we reject as erroneous Roach's premise that Officer Kruger's initial frisk negated reasonable suspicion that he was armed and rendered the subsequent frisks unlawful.

Roach also argues that Terry frisks are limited to searching for weapons and that Detective Pritchard could not search his pants unless he believed the bulge to be a weapon. But Roach misstates the governing law. Under the "plain feel" doctrine set forth in Minnesota v. Dickerson, 508 U.S. 366

11

(1993), an officer may seize contraband other than weapons during a lawful Terry search so long as the officer "feels an object whose contour or mass makes its identity immediately apparent." Id. at 375; see also United States v. Hernandez-Mendez, 626 F.3d 203, 213 (4th Cir. 2010). Here, the identity of the bulge as contraband was "immediately apparent" to the officers. Detective Pritchard's removal of the contraband was therefore justified under the "plain feel" doctrine.

Finally, Roach argues that the dog's alert, which indicated the presence of narcotics in the vehicle, was not sufficiently particularized cause to search him. The dog, however, specifically alerted by the front passenger's seat where Roach had been sitting. Moreover, probable cause is not based on any single factor in isolation, but rather on the totality of the circumstances.

Here, the totality of the circumstances justified Detective Pritchard's search of Roach.

C

Finally, we consider Roach's contention that the officers unreasonably prolonged his detention and exceeded the initial justification for the traffic stop. Roach argues that the officers, despite stopping him for a littering violation,

12

improperly extended the detention in order to provide more time for the narcotics-detection dog to arrive.

"The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). "Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." Id. If an officer extends the detention beyond the scope of a routine traffic stop, he or she must possess either the person's consent or a "reasonable suspicion" that illegal activity is afoot. Id.

We note that an officer's mere inquiry into matters beyond the initial justification for the stop — in this case, littering — does not automatically render the traffic stop unduly prolonged or unlawful. "Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." Johnson, 555 U.S. at 325. Thus, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Id.

Here, we readily conclude that the officers' frisks of Roach, while unrelated to the littering violation, did not "measurably extend the duration of the stop." Although Roach

13

contends that the officers unreasonably prolonged the stop to await the narcotics-detection dog, the district court found that the dog arrived within approximately two minutes of the initiation of the stop. Roach's claim that this minutes-long "extension" amounted to dilatory action is meritless. See, e.g., United States v. McFarley, 991 F.2d 1188, 1193 (4th Cir. 1993) (upholding 38-minute detention upon reasonable suspicion to await arrival for narcotics-detection dog). It is especially meritless, moreover, in light of Roach's obstruction of Officer Kruger's frisk, which instigated the imposition of handcuffs and thereby contributed to the duration of the stop. See United States v. Sharpe, 470 U.S. 675, 687-688 (1985) ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute[d] to the added delay about which he complains"). Thus, the traffic stop did not last longer than necessary.

Moreover, even if the detention did exceed the duration of a routine stop, the officers had "reasonable suspicion" that illegal narcotics activity was afoot. See Branch, 537 U.S. at 336. That suspicion existed before the stop and increased during the stop in light of the driver's actions, Roach's movements in the car, Roach's resistance while being frisked, and the bulge discovered in Roach's buttocks area.

In short, we conclude that Roach's detention was not unreasonably prolonged, but that even if it were, the officers possessed the requisite reasonable suspicion of a crime to justify its duration.

* * *

For the foregoing reasons, we affirm the district court's denial of Roach's motion to suppress.

<u>AFFIRMED</u>